**In re Barbara J. MURRY–HUDSON, Debtor.**

Bankruptcy No. 4–90–00172 P–2.

United States Bankruptcy Court, N.D. California.

Dec. 8, 1992.

Max Cline, Oakland, CA, for debtor.

Marc A. Fisher, Alameda, CA, for creditor Ford Motor Credit Co.

Paul de Bruce Wolff, Alameda, CA, Chapter 13 Trustee.

ORDER AND MEMORANDUM DECISION

RANDALL J. NEWSOME, Bankruptcy Judge.

This Chapter 13 case is before the Court pursuant to the motion of debtor Barbara J. Murry–Hudson ("Hudson") to compel creditor Ford Motor Credit Company ("Ford") to comply with the terms of Hudson's confirmed Chapter 13 plan. That plan requires Ford to release its lien on the debtor's automobile once its secured claim is paid. Hudson has paid Ford's secured claim on her automobile, and now seeks to have Ford turn over the certificate of title. Ford opposes debtor's motion, and urges that it not be required to deliver the certificate of title until Hudson completes her plan and receives her discharge. Alternatively, it suggests that the certificate of title be lodged with the Chapter 13 trustee, who would deliver it to the debtor upon the final payment provided for in the plan.

At the August 13, 1992 hearing the parties essentially stipulated to all of the facts which are relevant and material to this

dispute. They may be summarized as follows:

On or about February 13, 1989 Hudson purchased a brand new 1989 Hyundai GL for $9957.68. Ford loaned her $8,957.68 towards this purchase and charged her interest at 18.91% per annum. After allowing for a $700 downpayment and $300 rebate, the total sales price of the car was $13,038.80. *See* attachment to Ford's proof of claim. Ford took a security interest in the automobile, which it duly perfected by causing it to be designated as lienholder on the certificate of title. Cal. Vehicle Code § 6300. In accordance with Cal. Vehicle Code § 4450, upon registering the Hyundai with the State, the certificate of title was issued to Ford as the "legal owner,"[1] and a registration card was issued to Hudson.

On January 11, 1990 Hudson filed this Chapter 13 case. Her Schedule A listed Ford as holding a secured claim of $4,370, and an unsecured claim of $4,504. This bifurcation of Ford's claim pursuant to § 506(a) of the Code was carried forward into her Chapter 13 plan, which provided that Ford would receive 100% of its $4,370 secured claim plus interest at 10% just as § 1325(b)(5) requires. Ford's unsecured claim was to be paid 70 cents on the dollar, the same as all other allowed unsecured claims. Hudson was to pay $311 per month for 50 months until all allowed claims were paid. Significantly, the plan (which is a standard form plan in use throughout the Northern District of California) also contained the following language:

Secured creditors shall retain their liens *until their allowed secured claims have been paid.*

(See "Chapter 13 Plan" attached hereto)

Subject to Hudson agreeing to maintain suitable insurance on the Hyundai, Ford accepted the plan, including the amount of its secured claim (i.e. the value of the Hyundai) and the strip-down of its lien.

As noted above, Hudson has paid off Ford's allowed secured claim, and asserts that the plan and the Code require Ford to deliver the certificate of title to her, even though the plan will not be completed for more than a year. By its own admission Ford's opposition to the motion centers on hypotheticals rather than the facts of this particular case. While it acknowledges (as it must) that the plan calls for the retention of its lien *until* its allowed secured claim is paid, it asserts that this language was never intended to require the creditor to release its lien when the claim is paid. According to Ford, to grant debtor's motion would invite all kinds of mischief by unscrupulous debtors. For example, nothing would prevent a debtor from paying off an allowed secured claim on day one, receiving the certificate of title bearing the release of the creditor's lien on day two, and dismissing his case as a matter of right pursuant to § 1307(b) on day three. While § 349(b)(1)(C) reinstates "any lien avoided under 506(d)," it would be "virtually impossible" according to Ford to re-perfect its secured status by being so noted on the title as mandated by Cal. Vehicle Code § 6300. If the debtor sold the car on day four, Ford's claim in this regard is probably not overstated. Even worse from Ford's perspective is the possibility that the debtor might sell the car on day three[2] and exercise his right under 1307(a) to convert the case to Chapter 7 at the appropriate time, i.e. when the proceeds from the sale of the car have vanished. Under this scenario, Ford would have lost its perfected security interest, and be left with only the dim hope of receiving any Chapter 7 dividend on its unsecured claim.

■ Before launching into a discussion of the issues raised by Ford, it is important to underscore the issues which are not be-

---

**1.** "Legal owner" includes "a person holding a security interest in a vehicle which is subject to the provisions of the Uniform Commercial Code ..." Cal.Vehicle Code § 370.

**2.** Under 1327(b) "the confirmation of a plan vests all of the property of the estate in the debtor unless the plan or the confirmation order state otherwise." Since the car would be free of any claim or interest of Ford once its secured claim is paid, nothing would prevent the debtor from selling the car without the need for court or chapter 13 trustee approval.

fore the Court. This dispute is not about the feasibility or good faith of Hudson's plan, or the valuation of the Hyundai. All of those matters were addressed and determined in the order confirming the plan, and the time has long since passed to challenge the validity of that order. For the same reason, this dispute does not involve the raging controversy over bifurcation of claims under 506(a) and avoidance of liens under § 506(d) in Chapter 13 cases. *Compare In re Bellamy,* 962 F.2d 176 (2d Cir. 1992) and *Sapos v. Provident Institution of Savings in Town of Boston,* 967 F.2d 918 (3d Cir.1992) (strip-down of liens permitted in Chapter 13 cases notwithstanding *Dewsnup v. Timm,* — U.S. ——, 112 S.Ct 773, 116 L.Ed.2d 903 (1992)) *with In re Nobleman,* 968 F.2d 483 (5th Cir.1992) (§ 1322(b)(2) prohibits strip-down of liens on personal residence in Chapter 13). Whatever the current status of the law may be on this issue, Ford's failure to object to the treatment of its claim prior to confirmation of the plan precludes it from doing so now. § 1327(a).

 The real source of Ford's complaint centers not on the legality of lien stripping under § 506, but upon the consequences and effect of lien stripping. In essence, Ford argues that the plan doesn't really mean what it says. I find that it can only be read to mean one thing: Ford's lien rights on the Hyundai ceased to exist once its allowed secured claim was paid, and Hudson was entitled to receive the certificate of title bearing Ford's release of its lien immediately thereafter.

While the plan language itself makes it unnecessary to look further in order to resolve the issue, the same result would adhere even absent such language. Section 1322(b)(2) clearly states that with the exception of claims secured solely by a debtor's personal residence, a debtor's Chapter 13 plan may "modify the rights of holders of secured claims...." If Ford's argument were to prevail, the right afforded by this statute would be a hollow one, indeed, since notwithstanding the bifurcation of its claim, its lien would survive beyond payment of its allowed secured claim. Giving the statute its plain meaning, it must be concluded that a Chapter 13 debtor is permitted not merely to alter the amount and terms of payment of her secured debts, but to hold the property free and clear of liens after paying the allowed secured claims in accordance with the provisions of her confirmed plan.

The concerns Ford raises regarding the possibility that debtors might dismiss or convert their Chapter 13 plans shortly after paying off their allowed secured claims and receiving their certificates of title for their automobiles appear more illusory than real. The plan confirmation process itself provides some protection against abuse. In order to have her plan confirmed, the debtor has the burden of establishing among other things that the plan is proposed in good faith (§ 1325(a)(3)), is in the best interests of creditors (§ 1325(a)(4)), and is feasible (§ 1325(a)(6)). If the trustee or an unsecured creditor objects, she must also meet the "disposable income" test of § 1325(b).

Where a debtor's plan proposes to modify the secured claim on an expensive automobile or one purchased on the eve of filing, the sole driving force behind the plan is to hold onto the car at whatever the price to all concerned, and where the plan proposes to pay a low percentage payout to the unsecured creditors, Courts routinely deny confirmation for failing to satisfy one or more the § 1325 prerequisites. *See, e.g. In re Dotson,* 124 B.R. 836 (Bankr. N.D.Okla.1991) (purchase of two luxury motor vehicles within months of filing found not to evidence good faith); *In re Jones,* 119 B.R. 996 (Bankr.N.D.Ind.1990) (plan evidenced bad faith where its sole purpose was to permit debtor to keep a recently-purchased Cadillac); *In re Rogers,* 65 B.R. 1018, 1022 (Bankr.E.D.Mich.1986) (plan which called for debtor to retain a Corvette upon which a large secured claim was owed while relinquishing a Chevrolet Cavalier did not meet "disposable income" test of § 1325(b), the Court noting that "the debtor is pampering her own psyche at the expense of her unsecured creditors."). Furthermore, should the secured creditor become aware of facts indicating

that the debtor has obtained confirmation of his plan through fraud, § 1330(a) allows the court to revoke the confirmation order.

Even if the confirmation process does not provide a complete shield against potential abuses, both state law and bankruptcy law provide Ford with some protection. Should a debtor opt to dismiss his case after receiving the certificate of title to his car, the effect of such dismissal would be to fully restore Ford's lien rights in the car pursuant to § 349(b)(1)(C). While Ford would have lost its status as the holder of a perfected security interest in the debtor's car when it released its lien and tendered the certificate of title, its security agreement with the debtor would be revived. Thus, upon dismissal it would hold an unperfected security interest in the automobile that is good as to the debtor (Cal. Comm.Code § 9201), and would be entitled to exercise its right of repossession under the terms of the security agreement and Cal.Comm.Code § 9503. Ford might even be able to re-perfect its security interest in the car under Cal.Vehicle Code § 5909, which provides that a vehicle which has been involuntarily transferred may be re-transferred to the legal owner upon presentation of evidence to the Department of Motor Vehicles establishing the right to such retransfer.[3]

If the debtor sells or hypothecates the car before Ford becomes aware of the dismissal, then Ford is left in the position it would have been in had debtor defaulted on the payments and never filed for bankruptcy. Indeed, in some respects its position might be even better, since it already would have received the value of its collateral through the plan (*See In re Mitchell,* 954 F.2d 557 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 303, 121 L.Ed.2d 226 (1992)), while being left with a deficiency claim against the debtor on the balance of its note. *See* Cal.Commercial Code §§ 9501–9504.

A conversion to Chapter 7 might impair the creditor's interests more than a dismissal. As a practical matter, however, the end result probably would be the same in most cases. Unlike § 349(b)(1)(C), § 348(a) does not revive liens which have been avoided pursuant to § 506(d). Assuming that the debt is dischargeable under § 523(a) and that no one prevails on an objection to discharge under § 727(a), the unsecured portion of Ford's claim would be discharged.

Again, however, Ford is probably left in no worse shape than if debtor had not filed bankruptcy. First, it would already have received the approximate value of its collateral, just as surely as if it had repossessed the car and sold it. Second, it is one thing to say Ford would be entitled to a deficiency claim outside of bankruptcy for any shortfall resulting from the sale of the car; it is altogether another thing to collect on that claim. The amount involved probably would not justify the legal expense of pursuing it, let alone trying to extract it out of the debtor. Even if this assumption is incorrect, the fact is that the debtor would have the unimpeded right to file a Chapter 7 case and have the deficiency discharged if Ford pursued a collection action.

---

**3.** The full text of the statute is as follows:

§ 5909. Involuntary transfers

(a) Whenever the title or interest of any owner or legal owner in or to a vehicle registered under this code passes to another otherwise than by voluntary transfer the new owner or legal owner may obtain a transfer of registration upon application therefor and upon presentation of the last certificate of ownership and registration card issued for the vehicle, if available, and any instruments or documents of authority or certified copies thereof as may be required by the department, or required by law, to evidence or effect a transfer of title or interest in or to chattels in such case.

(b) The department when satisfied of the genuineness and regularity of the transfer shall give notice by mail to the owner and legal owner of the vehicle as shown by the records of the department and five days after the giving of the notice, if still satisfied of the genuineness and regularity of such transfer, shall transfer the registration of the vehicle accordingly. Such notice shall not be required for a transfer described in Section 5601.

I assume without deciding that the transfer of title to the debtor pursuant to a Chapter 13 plan would be deemed "otherwise than ... voluntary" for purposes of this statute.

Finally, it seems unlikely that a crafty but unscrupulous debtor would opt for the conversion route. In doing so, he would deprive himself of the super discharge he would be entitled to receive under § 1328 at a time when the plan would be well on its way or even nearing completion. By the same token, he would be at risk of having costly and potentially ruinous lawsuits brought against him under § 523(a) and § 727(a), perhaps by the very secured creditors whose liens were stripped down in the Chapter 13 case. *See* §§ 348(d); 727(a)(2).

The debtor also runs the risk of having his conversion scheme foiled entirely. While § 1307(a) gives a debtor the unbridled right to convert to Chapter 7, it does not give him the unbridled right to remain there. If he has the ability to complete his Chapter 13 plan, or the Court otherwise finds that the granting of Chapter 7 relief would be a substantial abuse of the provisions of that chapter, his case could be dismissed pursuant to § 707(b). *See In re Kelly*, 841 F.2d 908 (9th Cir.1988).

The undersigned is sensitive both to the concerns raised by Ford in this case, as well as the need for efficient administration of the over 4000 Chapter 13 cases pending on my docket. However, the statute must be read as it is written, if at all possible. That is true even when its application alters creditors' rights irrevocably, as it sometimes does. *See e.g.*, §§ 363(b); 365(a). Here, the debtor is receiving no windfall, and the creditor is receiving approximately what it would receive under state law—maybe more. Both are receiving what the plan and the plain meaning of the Code allow. Accordingly, debtor's motion is hereby GRANTED.

### APPENDIX
### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF CALIFORNIA

In re: ] Case No.

BARBARA J. MURRY–HUDSON ] Chapter 13 Plan

_____ ]

 Debtor(s)

1. The future earnings of the debtor(s) are submitted to the supervision and control of the trustee, and the debtor(s) shall pay to the trustee the sum of $ __311.00__ for __50__ months or until all allowed claims are paid.
 Debtor(s) elect a voluntary wage order: Yes __X__ No _____

2. From the payments so received, the trustee shall make disbursements as follows:
 (a) To the expenses of administration required by 11 USC § 507(a)(1) in deferred payments.
 (b) To secured creditors whose claims are allowed as follows:

| Name | Value of Collateral | Monthly Payment (If fixed) | Interest Rate (If specified) |
|---|---|---|---|
| Ford Motor Credit | $4,370 | none | 10% |

[The valuations shown above shall be binding unless a timely objection to confirmation is filed. Secured claims shall be allowed for the value of the collateral or the amount of the claim, whichever is less, and shall be paid in the monthly installments and at the interest rates shown above. If the monthly payment is not fixed, secured creditors will share pro rata. If an interest rate is not specified, ⅚% per month (10% per annum) will be paid. Secured creditors shall retain their liens until their allowed secured claims have been paid. The remainder of the amount owing, if any, shall be allowed as a general unsecured claim paid under the provisions of paragraph 2(d).]

(c) To priority creditors in the order prescribed by 11 USC § 507.

(d) To unsecured creditors whose claims are allowed. <u>Unsecured claims shall be paid 70 cents on the dollar.</u>

3. The following executory contracts of the debtor are rejected and the debtor shall surrender possession of the subject property. Any allowed unsecured claim for damages resulting from rejection shall be paid under paragraph 2(d).

n/a

4. <u>The debtor(s) shall pay directly the following fully secured creditors and lessors:</u>

| Name | Direct Monthly Payment |
|------|------------------------|
| none | |

5. The date this case was filed shall be the effective date of the plan as well as the date when interest ceases accruing on unsecured claims.

6. The Court may, after hearing upon such notice as the Court may designate, increase or reduce the amount or the time for payments where it appears that circumstances so warrant.

7. Optional provisions pursuant to 11 USC § 1322(b):

DATED: 1-11-90 (s) Barbara J. Murry-Hudson