In re Kenneth George SCHEIERL and Susan Lynn Scheierl aka Susan Lynn Benson, Debtors.

Bankruptcy No. 3–93–3500.

United States Bankruptcy Court, D. Minnesota, Third Division.

Jan. 6, 1995.

Curtis K. Walker, Minneapolis, MN, for debtors.

Bradley J. Halberstadt, Mackall, Crounse & Moore, P.L.C., Minneapolis, MN, for Gen. Motors Acceptance Corp.

## MEMORANDUM TO ORDER DENYING CONFIRMATION OF PLAN

GREGORY F. KISHEL, Bankruptcy Judge.

This is a Chapter 13 case. On September 30, 1994, the Court entered an order that denied confirmation of the Debtors' plan of debt adjustment, sustaining the objection of General Motors Acceptance Corporation ("GMAC") thereto. This memorandum contains the findings of fact and conclusions of law on which that order was based, pursuant to FED.R.CIV.P. 52(a), *as incorporated by* FED.R.BANKR.P. 7052 and 9014.

The Debtors filed a voluntary petition for relief under Chapter 13 on July 19, 1993. GMAC is a scheduled secured creditor of theirs. It holds a security interest in a 1990 Pontiac LeMans automobile, as a term of the financing it provided to the Debtors for the purchase of that vehicle. As of the commencement of this case, the fair market value of the vehicle was approximately $4,850.00, and the "net payoff" balance of the debt chargeable against it was approximately $6,520.00.[1] Under the terms of 11 U.S.C. § 506(a),[2] then, GMAC holds two claims for the purposes of this case and the administration of the Chapter 13 plan and estate: a secured claim in the amount of $4,850.00, and a general unsecured claim for the balance of its debt (approximately $1,700.00).

---

1. The Debtors and GMAC agreed to these figures for the purposes of the confirmation proceedings.

2. In pertinent part, this statute provides as follows:

   An allowed claim of a creditor secured by a lien on property in which the [bankruptcy] estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

The Debtors proposed their plan on the standard local form promulgated by this Court some years ago, and that was in force until June 1, 1994. The form of the plan contained generic language that established a framework under which secured creditors' specific expectations of repayment were to be fixed and finalized at the meeting of creditors. At the meeting, the value of the secured portion of creditors' undersecured claims was determined by a process of negotiation, over which the Trustee presided. The Trustee then determined the amortizations of the various claims and their priority in the timing of the draw on the payment stream out of the Chapter 13 estate.[3]

In that regard, the Debtors' plan has two operative provisions. The first is contained in its second paragraph, entitled "Classes":

> Each secured claim is designated as a separate class, shall be determined under 11 U.S.C. § 506 and shall be paid the amount allowed as of the effective date of the plan ... and each holder thereof shall retain the lien securing such claim until the claim is paid.

The second term is contained the fourth paragraph, entitled "General Provisions":

> Upon completion of payment of the secured portion of any claim, the property securing said claim shall vest in the debtor free and clear of any lien, claim or interest of the secured creditor.

As the Debtors' counsel acknowledges, he and his clients intend the latter provision to have a very specific and pointed import for GMAC: once the Trustee has made distribu-

tions to GMAC that have a total present value of $4,850.00,[4] the Debtors will be entitled to demand that GMAC return the Certificate of Title to the vehicle to them, with the endorsement or separate document that the Minnesota Department of Motor Vehicles currently requires to evidence a full release of GMAC's lien. GMAC strenuously objects to the confirmation of any plan that would compel it to release its lien of record before the Debtors complete *all* payments to the Trustee under their plan, on account of both secured and unsecured claims. The factual scenario and legal issues are virtually the same as those presented in *In re Lee,* 156 B.R. 628 (Bankr.D.Minn.1993) (O'Brien, J.), *aff'd,* 162 B.R. 217 (D.Minn.1993).

Before engaging in any discussion, it is important to identify just what is at issue here, and what is not.

What is *not* at issue is the Debtors' legal right to use the so-called "Chapter 13 cramdown" against GMAC as a secured creditor— that is, to use the procedure of debt adjustment to reduce the amount of the debt obligation that is chargeable against the automobile as security, down to the value of the underlying collateral, and to reamortize the reduced amount of the secured claim. *Sapos v. Provident Instit. of Savings,* 967 F.2d 918, 921 (3d Cir.1992); *Landmark Financial Services v. Hall,* 918 F.2d 1150, 1153–54 (4th Cir.1990). *See also· In re Green,* 151 B.R. 501, 506 (Bankr.D.Minn.1993). Nor is the Debtors' basic right to "lien-strip" GMAC's security interest from the automobile, at some point during the effectuation of the cramdown remedy.[5] GMAC tacitly conceded

---

3. On June 1, 1994, the judges of this Court promulgated a new prescribed form for Chapter 13 plans. The new form requires the debtor to designate the amount of the secured component of undersecured claims on the face of the plan, and to specify the proposed amortizations of such claims. At the cost of losing some "flexibility" in arriving at the final terms of a plan in the initial confirmation process, the change addresses a major deficiency in the prior procedure: before, the only memorialization of the actual terms of payment on account of secured and unsecured claims was that programmed into the Trustee's computer software. The public record had no more than a very cursory summary. That was in the form of a photocopy of the Trustee's minute sheet from the meeting of creditors; it usually was not pinned into the court file until

just before the confirmation hearing, and it did not detail the amount, duration, or timing of monthly distributions to any particular class of creditors.

4. As the Trustee administered estates under the old form plan, secured claims such as automobile loans received a high priority in time of distribution—invariably just after the payment of debtors' counsel's allowed claims for compensation, and generally on a concurrent basis with the cure of arrearages on ·homestead mortgage obligations.

5. The origin of the phrase "lien-stripping" lies somewhere in the welter of caselaw in most of the Circuits, which eventually led to the Supreme

both of these points to the Debtors.[6] This case, then, does not pose the threshold issue treated in such published decisions as *In re Jones,* 152 B.R. 155 (Bankr.E.D.Mich.1993)[7] and *In re Hernandez,* 162 B.R. 160 (Bankr. N.D.Ill.1993).[8]

Concomitantly, GMAC does not deny that the Debtors will have the right to demand that GMAC formally release its lien of record, at *some* future time after they pay the full amount of GMAC's allowed secured claim. GMAC is well-put in not denying this either, as it is a necessary corollary to the first concessions. It also follows from basic principles of the law of contract and of secured transactions.

Finally, the dispute at bar does not really raise the issue of where the legal title to the vehicle, or the claim to the "equity" in it, will repose during the pendency of the case. While the Debtors do purport to alter the sequence by which the equity accrued post-petition would "vest" in them, it is beside the point whether they will nominally hold this value while the case remains under Chapter 13, or the bankruptcy estate will.

■ What is really at issue is whether GMAC's security interest will continue to have some nexus to the vehicle, or whether the Debtors can get it severed after they pay off the secured component of GMAC's claim but before they finish their plan in its entirety. Of all of the published Chapter 13 decisions dealing with lien-stripping as to loans secured by personal property collateral, only three—*Lee, Jones,* and *In re Murry–Hudson,* 147 B.R. 960 (Bankr.N.D.Cal.1992)— have arguably framed the issue in this way.

As might have been expected, one party in this case loudly extolled the reasoning of *Lee* and the other roundly criticized it. In his decision, Judge O'Brien held that plan language identical to that in question here operated to the result that is urged by the Debtors. He rejected the argument of the secured creditor that the rationale of *Dewsnup v. Timm* extended to prohibit the use of 11 U.S.C. § 506(d)[9] to strip down personal property liens in Chapter 13 cases. In doing so, he held:

> The disputed language in the [Lees'] Plan does not purport or operate to "void" or "avoid" a lien under 11 U.S.C. § 506(d). It simply provides that when the secured

Court's decision in *Dewsnup v. Timm,* 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992). The Supreme Court adopted a variant of the expression by terming the proposal of the debtor before as one that would "strip down" the attachment of a mortgage against a homestead so as to correspond to the lesser value of the property— apparently as a preliminary to a tender of the reduced amount at or after a post-bankruptcy foreclosure sale.

**6.** It is well-put in doing so; the wording of 11 U.S.C. §§ 1322(b) and 506(a) clearly makes these instrumentalities of debt adjustment available to Chapter 13 debtors. The former statute sets forth a number of functions that a Chapter 13 debtor is permitted to use in a plan. They include the ability to
> modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence ...

11 U.S.C. § 1322(b)(2). The latter statute was quoted *supra* at n. 2.

**7.** After a lengthy and precise discussion of the statutory text, legislative history, and extant case-law, the *Jones* court concluded that lien-stripping was available in Chapter 13.

**8.** In *Hernandez,* the court concluded that a lien against an automobile survives a grant of Chapter 13 discharge unless the full amount of the pre-petition claim is paid during the case, and will continue to encumber the automobile until consensually released by the secured party. In summarily citing *Dewsnup* to support this conclusion, the *Hernandez* court ignore the fact that the Supreme Court expressly limited its holding to the facts before it—involving a debtor in Chapter 7 and a homestead mortgage—and expressly reserved the application of the same statutes to different forms of bankruptcy relief for other cases. 502 U.S. at 416–18, 112 S.Ct. at 778. As other courts have pointed out, such a rigid application of *Dewsnup* would destroy the effectiveness of reorganization and individual debt adjustment in bankruptcy. *E.g., In re McDade,* 148 B.R. 42 (Bankr.S.D.Ill.1992).

**9.** This statute provides in pertinent part as follows:
> (d) To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void, unless—
> > (1) such claim was disallowed only under [11 U.S.C. §§ ] 502(b)(5) or 502(e) ...; or
> > (2) such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under [11 U.S.C. §] 501 ...

claim, determined through application of 11 U.S.C. §§ 506(a) and 1322(b), has been paid in full pursuant to 11 U.S.C. § 1325(a)(5)(B), the lien will have been satisfied as contemplated by the Code, and the property will vest in the [Lees] free and clear of [the secured party's] lien as allowed and provided for by 11 U.S.C. § 1327(b) and (c).

156 B.R. at 630–631.

On appeal, the District Court (MacLaughlin, J.) summarized the then-extant caselaw at length. Judge MacLaughlin noted that the secured creditor

appear[ed] to concede that the plain language of section 1322(b) indicates that [the] debtors may strip down [the secured party's] lien to the value of the collateral,

162 B.R. at 222; he then held that, in any event, the relevant statutes made lien-stripping available to a Chapter 13 debtor, for claims secured by personal property collateral, 162 B.R. at 223.

Judge MacLaughlin then addressed the second issue posed by the secured creditor's appeal: whether the debtors could obtain confirmation of a plan that provided that the collateral securing a claim would "vest in the debtor free and clear of any lien, claim or interest of the secured creditor," once the debtor had completed payment on account of the secured portion of the creditor's claim. Citing the permissive provision of 11 U.S.C. § 1322(b)(9) that

the plan may ... provide for the vesting of property of the estate, on confirmation of the plan or at a later time, in the debtor,

and opining that the secured party had no sustainable objection to the treatment of its secured claim as long as the plan provided that it would receive the present value of the amount of that claim, he went on without further authority or analysis to conclude that

the bankruptcy court properly approved [sic] the plan despite the fact that [the] collateral will vest with [the Lees] prior to completion of the plan.

162 B.R. at 225. In closing, he dismissed the "policy considerations" that the secured party had advanced to urge that a divestment of liens on the public record be deferred until Chapter 13 debtors fully perform all of their obligations under confirmed plans; he first "agree[d] with the bankruptcy court's conclusion that such policy considerations are best left to Congress," 162 B.R. at 225, and then dismissed the secured party's concern that debtors might unfairly manipulate the lien-stripping remedy as "more illusory than real," *id.*

Other Bankruptcy Courts have reached the same result in several different procedural contexts, on much the same reasoning. *E.g., In re Cooke,* 169 B.R. 662, 667–68 (Bankr.W.D.Mo.1994); *In re Schultz,* 153 B.R. 170, 173 (Bankr.S.D.Miss.1993); *In re Pickett,* 151 B.R. 471, 473–74 (Bankr. M.D.Tenn.1992); *In re Murry–Hudson,* 147 B.R. at 962; *In re Hargis,* 103 B.R. 912, 915–16 (Bankr.E.D.Tenn.1989). The unspoken predicate of all of these decisions is that the Code *mandates* that debtors be allowed to use the lien-stripping remedy as soon as they have completed debt service under the cramdown of an undersecured claim.

There are at least four major deficits in the reasoning that underlies this group of decisions.

The first is specific to the *Lee* decisions: the erroneous pronouncement at the Bankruptcy Court level, that § 506(d) has no substantive relevance to the problem at bar. *See* 156 B.R. at 630–31 (quoted *supra* at pp. 501–02). While they recognize the central importance of § 506(a) to this particular debtor's remedy, the *Lee* courts refuse to recognize that § 506(d) works with it, hand in hand, to guide the modification of undersecured claims in reorganization and debt adjustment cases. Section § 506(a) furnishes the legal basis for writing the charge of the debt against collateral down to the collateral's value. Section § 506(d) then detaches the lien from the security to the extent that the pre-existing debt exceeds that value.[10]

---

**10.** The § 506 remedy, of course, is a preliminary to the reamortization of the reduced secured claim. *Landmark Financial Services v. Hall,* 918 F.2d at 1154. The whole process functions, in theory, to reduce the demands of debt service on secured clams down to a level where financially-distressed debtors can meet them from future

Without much discussion, the *Lee* courts accepted their debtors' theory that a judicially-ordained "vesting" of property rights back in them somehow can clear off every last impediment to title or value that was not preserved in their plan. Such a "revesting," however, does nothing to affect the extent of a creditor's pre-existing secured rights in the subject asset. In itself, "revesting" can only transfer legal title from the fictive possession of the bankruptcy estate back to the debtor; it cannot affect the status of liens. The concepts of "secured claim" and "unsecured claim" have no vitality under law, outside the contest of *bankruptcy estate administration.* The derivative notion of bifurcating a secured creditor's rights so as to limit its control over its collateral is certainly alien to nonbankruptcy law. Absent some form of legal divestment like that afforded by § 506(d), there can be no true distinction between the secured and unsecured components of an undersecured claim, even in the special context of a bankruptcy case.

By giving these statutory concepts a decisive import insofar as the extent of lien rights is concerned, the *Lee* rationale erroneously elevates them to a plane far beyond the one they actually hold. Section 506(d) gives § 506(a) its teeth, insofar as the administration of assets subject to undersecured claims is concerned. So, contrary to the summary pronouncement in *Lee,* the effectuation and enforcement of plan language like that at issue here *is* driven by the authority of § 506(d).

The second problem with *Lee* is related, but broader: it carries one technique of statutory construction to excess. That method, of course, is textualism, or the so-called "plain language" approach to the construction and application of statutes. In most of its recent bankruptcy jurisprudence, the Supreme Court has explicitly applied this technique, favoring a "common-sense" construction of the language of the Bankruptcy Code on its face, as the predominant means for fixing the scope and effect of its various provisions. *Rake v. Wade,* — U.S. —, — – —, 113 S.Ct. 2187, 2192–93, 124 L.Ed.2d 424 (1993); *Patterson v. Shumate,*

income. *United Carolina Bank v. Hall,* 993 F.2d

— U.S. —, — – —, 112 S.Ct. 2242, 2246–47, 119 L.Ed.2d 519 (1992); *Taylor v. Freeland & Kronz,* 503 U.S. 638, — – —, 112 S.Ct. 1644, 1647–48, 118 L.Ed.2d 280 (1992); *Barnhill v. Johnson,* 503 U.S. 393, — – —, 112 S.Ct. 1386, 1388–91, 118 L.Ed.2d 39 (1992); *U.S. v. Nordic Village, Inc.,* 503 U.S. 30, 32–38, 112 S.Ct. 1011, 1014–16, 117 L.Ed.2d 181 (1992); *Union Bank v. Wolas,* 502 U.S. 151, 160–62, 112 S.Ct. 527, 533, 116 L.Ed.2d 514 (1992); *Toibb v. Radloff,* 501 U.S. 157, 160–61, 111 S.Ct. 2197, 2199–2200, 115 L.Ed.2d 145 (1991); *Hoffmann v. Connecticut Dept. of Income Maintenance,* 492 U.S. 96, 101–02, 109 S.Ct. 2818, 2822–23, 106 L.Ed.2d 76 (1989) (plurality opinion).

■ However, in applying textualism the courts should take heed of the "big picture." Even where the "plain meaning" methodology is applied, "statutory language must always be read in its proper context." *McCarthy v. Bronson,* 500 U.S. 136, 139, 111 S.Ct. 1737, 1740, 114 L.Ed.2d 194 (1991); *U.S. v. Neville,* 985 F.2d 992, 995 (9th Cir.1993). Just as a single word in a statute cannot be read in isolation, neither can a single provision. *Smith v. U.S.,* — U.S. —, —, 113 S.Ct. 2050, 2056, 124 L.Ed.2d 138 (1993); *U.S. Nat'l Bank of Oregon v. Independent Ins. Agents of America, Inc.,* — U.S. —, —, 113 S.Ct. 2173, 2182, 124 L.Ed.2d 402 (1993).

> A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because[, among other reasons,] . . . only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law . . .

*United Savings Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd.,* 484 U.S. 365, 371, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988) (citations omitted). A single provision of a statute may "not be interpreted so as to defeat the general purpose that animates and informs a particular legislative scheme." *Milwaukee County v. Donovan,* 771 F.2d 983, 986 (7th Cir.1985). *See also Bob Jones*

1126, 1129 (4th Cir.1993).

*Univ. v. United States,* 461 U.S. 574, 586, 103 S.Ct. 2017, 2025–26, 76 L.Ed.2d 157 (1983).

Thus, in attempting to ascertain the meaning of isolated provisions of comprehensive statutes the courts must still construe them in light of several contextual factors: the regulatory objectives and policy bases of the entire enactment, *Philbrook v. Glodgett,* 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975), *In re Windsor on the River Assoc., Ltd.,* 7 F.3d 127, 130 (8th Cir.1993), and *Don't Tear it Down, Inc. v. Pennsylvania Avenue Dev. Corp.,* 642 F.2d 527, 533 (D.C.Cir.1980); the problems that the statute was generally designed to address, *Scott v. Moore,* 640 F.2d 708, 727 (5th Cir.1981); and the backdrop of predecessor legislation, *Dewsnup v. Timm,* 502 U.S. at 419–20, 112 S.Ct. at 779. *See, in general, Kifer v. Liberty Mut. Ins. Co.,* 777 F.2d 1325, 1332 (8th Cir.1985). The courts can divine the general sense of legislative intent from the way in which the various components of a comprehensive enactment interact to effect its overall goal. *King v. St. Vincent's Hospital,* 502 U.S. 215, 220–22, 112 S.Ct. 570, 574, 116 L.Ed.2d 578 (1991); *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291, 108 S.Ct. 1811, 1817–18, 100 L.Ed.2d 313 (1988); *DAE Corp. v. Engeleiter,* 958 F.2d 436, 439 (D.C.Cir.1992); *Powell v. Comm'r of Internal Revenue,* 791 F.2d 385, 390 (5th Cir.1986).

All of this is no less true in bankruptcy matters than it is in any other context in which a code creates the governing law. *Kokoszka v. Belford,* 417 U.S. 642, 645, 94 S.Ct. 2431, 2433, 41 L.Ed.2d 374 (1974) (the general purposes of federal bankruptcy law govern the construction of the scope and limitations of individual statutory provisions of that law).

*Lee* and its companion decisions rely solely on several sentences from isolated provisions of Chapters 5 and 13 as the authority for their holdings. They do not fully recognize the broader context for them—that Chapter 13 is a collective proceeding, in which debtors can—and must—propose and effect a *comprehensive* solution to their difficulties with creditors. A Chapter 13 plan is appropriately termed a "new contract" running between the debtor and all of his creditors. 11 U.S.C. § 1327(a).[11] *See also In re Babbin,* 156 B.R. 838, 850 (Bankr.D.Colo.1993), *rev'd in part on other grounds,* 160 B.R. 848 (D.Colo. 1993); *In re Nicholson,* 70 B.R. 398, 400 (Bankr.D.Colo.1987); *In re Winterfeldt,* 28 B.R. 486, 488 (Bankr.E.D.Wis.1983). Like any contract, this one embodies bilateral covenants and considerations. Those pertinent to the debtor's status are simply summarized: in return for the completed performance of a promise to make payments pursuant to the plan, the debtor receives the permanent benefit of an adjustment of pre-petition obligations, discharge of debts, and various ancillary remedies. What *Lee* does not acknowledge is that this contract really has to await the debtor's full performance before the benefit of any of his statutory remedies may become final, binding, and fully effectuated on the public record.

■ This principle is not explicitly articulated in the Bankruptcy Code and Rules, but its resonance is evidenced in two provisions. 11 U.S.C. § 1307(b) gives the debtor an unfettered right to obtain dismissal of his case at any time, on an *ex parte* basis and without a showing of cause.[12] In the event of such a dismissal, 11 U.S.C. § 349(b) restores the full pre-petition *status quo* as to the debtor's property rights, and his creditors' competing claims against them.[13] These pro-

---

**11.** This statute provides as follows:
> The provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan.

**12.** This statute provides as follows:
> (b) On request of the debtor at any time, if the case has not been converted under [11 U.S.C. §§ ] 706, 1112, or 1208 ... the court shall

dismiss a case under [Chapter 13]. Any waiver of the right to dismiss under this subsection is unenforceable.

**13.** It does so by providing, in those parts pertinent to this case:

visions answer the question of whether a debtor's effort in Chapter 13 has any final, binding effect on creditors' rights if the debtor leaves bankruptcy before full performance under his plan. They certainly mean that a Chapter 13 case cannot bring about any permanent reordering of property and contract rights, partial or comprehensive, until the debtor meets a threshold requirement: entitlement to a discharge, by "complet[ing] ... all payments under the plan" pursuant to 11 U.S.C. § 1328(a).

■ These characteristics of Chapter 13 are important to the present dispute, because they evidence Congress's intent that the full fruition of a Chapter 13 cramdown on a secured creditor is all of a piece with the discharge, which is the central debtor's remedy. In other instances where the Code creates individual debtor remedies that affect the secured rights of creditors, it does so to promote the debtor's post-discharge "fresh start." *E.g.*, H.R.REP. No. 595, 95th Cong. 1st Sess. 362 (1977) U.S.Code Cong. & Admin.News 1978, pp. 5787, 6319 (11 U.S.C. § 522(f) "protects the debtor's exemptions, his discharge, and thus his fresh start by permitting him to avoid certain liens on exempt property"). The remedies of secured-creditor cramdown and lien-stripping, as they are granted by §§ 1322(b), 1325(a)(5)(B), 506(a), and 506(d), serve essen-

tially the same purpose: to allow a debtor to retain possession of pledged assets through and after the term of the plan, with the concomitant—and potentially substantial—benefit of a reduction of the financial burden of that retention.[14]

However, these remedies so drastically alter the pre-petition contractual rights and expectations of secured creditors that they veer close to an alteration of property rights in collateral. Since the lien-stripping that effectuates a § 1325(a)(5)(B) cramdown cuts so powerfully against creditors' rights under state law, it simply should not be applied by the courts as an isolated remedy during the pendency of a case. To do so plucks it entirely out of context, with a micro-focus that denies the "global" nature of the process of debt adjustment under Chapter 13.[15]

■ The third shortcoming of *Lee* and its companion decisions is their failure to recognize that the provisions of §§ 1322(b)(2) and 1322(b)(9) are not the exclusive statutory governance for this situation. Latching onto operative language that only creates the parameters of a power potentially available to debtors, these decisions ignore another provision of the Code that imposes a crucial restriction on the nearly-unlimited powers otherwise suggested by these two subsections. Any modification of secured rights under

(b) Unless the court, for cause, orders otherwise, a dismissal of a [bankruptcy] case

   (1) reinstates—

   (B) Any transfer avoided under [11 U.S.C. §§ ] 522, 544, 545, 547, 548, 549, or 724(a) ... or preserved under [11 U.S.C. §§ ] 510(c)(2), 522(i)(2), or 551 ... and
   (C) any lien voided under [11 U.S.C. § ] 506(d) ...;
   (2) vacates any order, judgment, or transfer ordered, under [11 U.S.C. §§ ] 522(i)(1), 542, 550, or 553 ... and
   (3) revests the property of the estate in the entity in which such property was vested immediately before *the commencement of the case* ...
Among other ways, then, this provision operates to return all assets recovered by a trustee that has exercised avoidance powers, to the entities that had received them pre-petition; to return liens subordinated or avoided by a trustee under 11 U.S.C. § 544 to their pre-petition enforceability under nonbankruptcy law; and to restore the

full attachment and enforceability of liens that collateralize undersecured claims.

14. It goes without saying that there are other benefits that do not run directly in the service of a fresh start. The retention of vehicles and business assets during the pendency of the case can enable a debtor to continue to generate income to apply to payments to all creditors under the plan. This indirectly promotes the fresh start, but it more directly benefits the collective creditor body—which is dependent on that income for its realization from the estate.

15. Applying it as a remedy outside the context of some more global form of bankruptcy relief might well violate the Fifth Amendment of the United States Constitution. *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 602, 55 S.Ct. 854, 896, 79 L.Ed. 1593 (1935). To save the statutory provisions at issue here from some sort of *Radford*-derived constitutional attack, the courts really should construe them so as to have application solely at the end of a Chapter 13 case.

§ 1322(b)(2) must still afford adequate protection to the creditor's interest in its collateral. 11 U.S.C. § 363(e).[16] *See also In re Pittman*, 8 B.R. 299, 301–02 (D.Colo.1981); *In re Lewis*, 8 B.R. 132, 136–37 (Bankr.D.Idaho 1981). This is so regardless of the identity of the party in whom the plan purports to "vest" that collateral, and in what way.

In turn, within the meaning of 11 U.S.C. § 361,[17] the structuring of adequate protection requires one to identify the nature and value of the creditor's secured interest and the risks inherent in allowing the debtor to retain the collateral. Then, the financial and legal terms under which the debtor will retain the collateral must be structured so as to afford the creditor the "indubitable equivalent" of the value of its secured interest. *In re Martin*, 761 F.2d 472, 476–77 (8th Cir. 1985).

In most cases, the risks that must be gauged for adequate protection analysis have their origin in economic or physical fact: such factors as ongoing wear and tear on tangible collateral, the profitability of a debt-or's post-petition business operations, and the likelihood of loss from fire, theft, or other casualty all spring from external forces in the "real world." In a Chapter 13 case, however, the court must recognize an additional risk that arises from a legal circumstance: the possibility that a debtor's plan may fail, with the dismissal or conversion of the case soon following. That risk has one economic dimension, inherent in the fact that the collateral will probably depreciate in value during the pendency of the case.[18] It has another one that portends even more cost and risk, however, if the debtor were allowed to lien-strip before the failure of the case. Whether the case then is converted or dismissed, the secured party is faced with a string of prospects that are quite burdensome, at minimum, and genuinely harmful, at worst.

■ If the case is converted, the secured party may or may not regain its lien rights in the subject asset.[19] If it does, however, it may find its lien vulnerable to avoidance by the Chapter 7 trustee in exercise of the "strongarm" powers under 11 U.S.C. § 544(a).[20]

**16.** In pertinent part, this statute provides:

(e) Notwithstanding any other provision of [11 U.S.C. § 363], at any time, upon request of an entity that has an interest in property used ... or proposed to be used, ... the court, with or without a hearing, shall prohibit or condition such use ... as is necessary to provide adequate protection of such interest.

**17.** In pertinent part, this statute describes "adequate protection" of an entity's interests as

(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under [11 U.S.C. § ]362 ..., use, sale, or lease under [11 U.S.C. § ] 363 ..., or any grant of a lien under [11 U.S.C. § ]364 ... results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, ... as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

**18.** Parties generally cope with this sort of risk by negotiating amortization terms to ensure that the anticipated value of the collateral over the term of the plan will continue to equal or exceed the contemporaneous balance of the debt.

**19.** Reasoning that § 506(d) operates to final effect once a secured debt is fully serviced in Chapter 13, some courts have held that a debtor is entitled to the release of the underlying liens after conversion of the case, without having to pay the full amount of the undersecured claim. *E.g.*, *In re Bunn*, 128 B.R. 281 (Bankr.D.Idaho 1991); *In re Tluscik*, 122 B.R. 728 (Bankr. W.D.Mo.1991); *In re Hargis*, 103 B.R. 912 (Bankr.E.D.Tenn.1989); *In re Estep*, 96 B.R. 87 (Bankr.E.D.Ky.1988); *In re Tunget*, 96 B.R. 89 (Bankr.W.D.Ky.1988). Reading the holding in *Dewsnup* broadly, however, the Sixth Circuit recently held to the contrary. *In re Burba*, 1994 WL 709314 (6th Cir. November 10, 1994). *See also In re Dennis*, 31 B.R. 128 (Bankr.M.D.Ga. 1983). The Eighth Circuit has not passed on this issue.

**20.** As the Eighth Circuit has noted, this statute allows the trustee to avoid unperfected liens, or at least to subordinate them. *In re Shuster*, 784 F.2d 883, 884 (8th Cir.1986). It does so by providing that

[t]he trustee shall have, as of the commencement of the [bankruptcy] case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

If the case is dismissed, the creditor's full lien would be restored by operation of § 349(b)(1)(C)—but it would still be an unperfected lien.

More to the point, however, is an eventuality of either outcome: the secured party would have the undesirable task of having to get its lien re-perfected, without any assurance of cooperation from the debtor. At the very least, this would require proving the current status of its rights to a state motor vehicle registry, county recorder, or other public records office—which might well demand an order of the Bankruptcy Court to evidence the creditor's right to re-perfection. Beyond this, the creditor would be vulnerable to the debtor's conversion of the value of the lien rights to his own benefit, were the debtor so unscrupulous as to sell the collateral before the lien were rememorialized.

There is only one way that the secured party can be adequately protected against this parade of possible harms, all of which were the result of the interposition of a failed bankruptcy remedy in the first place. Regardless of what may happen to the lien on the theoretical plane during the pendency of the case, the secured party must retain its lien of record until the debtor completes payments and receives a discharge. If the debtor wishes to sell, trade, or discard collateral before the completion of the plan, he should bear the onus of bringing on a motion for leave to do so under color of 11 U.S.C. §§ 363(b)(1) and 363(e).[21] This is really the fairest allocation of the procedural burden of going forward, considering the central principle that drove the result in *Dewsnup*.[22]

The fourth difficulty with *Lee* and its companion decisions is subsidiary to the other three, but nonetheless worth noting: the dismissive way they treat the "public policy" aspect of the problem. *In re Lee*, 162 B.R. at 225; *In re Murry–Hudson*, 147 B.R. at 962 (summarily characterizing secured creditor's concerns as "more illusory than real"). In point of fact—and as just noted—secured creditors' concerns over preserving the protection of a perfected lien actually implicate their statutory right to adequate protection— a central focus of most phases of the bankruptcy process. In any event—and again as discussed earlier—*Lee* and *Murry–Hudson* rather inexplicably ignore the fact that the conversion or dismissal of a Chapter 13 case should restore a secured creditor to its rightful *status quo ante*, legal and contractual, by operation of law—and, in such event, the Bankruptcy Court has no business giving the debtor either the semblance or the actuality

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists; (2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or (3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

21. The first cited statute provides:
The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.
In pertinent part, the second one provides:

(e) Notwithstanding any other provision of [11 U.S.C. § 363], at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.
Debtors in Chapter 13 have the rights and powers of a trustee under both of these provisions 11 U.S.C. § 1303.

22. This precept, of course, is that properly-perfected liens against a debtor's assets survive a bankruptcy filing and remain fully-enforceable after a grant of discharge, absent consensual satisfaction or avoidance via a remedy expressly created in bankruptcy or nonbankruptcy law. It has been a fundament of American bankruptcy law for over a century. *See Dewsnup v. Timm*, 502 U.S. at 416–20, 112 S.Ct. at 778–79. *See also Johnson v. Home State Bank*, 501 U.S. 78, 83–85, 111 S.Ct. 2150, 2154, 115 L.Ed.2d 66 (1991); *Farrey v. Sanderfoot*, 500 U.S. 291, 296–98, 111 S.Ct. 1825, 29, 114 L.Ed.2d 337 (1991); *Long v. Bullard*, 117 U.S. 617, 620–21, 6 S.Ct. 917, 918, 29 L.Ed. 1004 (1886).

of remedies to which he is not statutorily entitled.

In summary, then: the proposed disposition of GMAC's secured status under the Debtors' proposal denied it the adequate protection that was comprehended by the requirements of §§ 1325(a)(5)(B) and 361(3). The Debtors cannot obtain confirmation of any plan that would empower them to demand a release of GMAC's lien of record before they complete all payments to all creditors under their plan, and receive a discharge. *Accord, In re Burba,* 1994 WL 709314, *13, *In re Jones,* 152 B.R. at 182–83.