**In re Brian YOUNG and Ruth A. Young, Debtors.**

**Bankruptcy No. 96–20202.**

United States Bankruptcy Court, E.D. Tennessee.

Aug. 23, 1996.

*MEMORANDUM*

MARCIA PHILLIPS PARSONS, Bankruptcy Judge.

This case is before the court upon the objection to confirmation filed by the holder of a second mortgage on the debtors' residence. The issue presented by the objection is whether 11 U.S.C. § 1322(c)(2), which was enacted as part of the Bankruptcy Reform Act of 1994, permits a "cramdown" [1] of an undersecured residential mortgage if final payment under the mortgage falls due during the life of the plan, notwithstanding 11 U.S.C. § 1322(b)(2) and the U.S. Supreme Court's ruling in *Nobelman v. American Savings Bank,* 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993). The court answers the question in the affirmative. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(L).

I.

This chapter 13 case was filed on February 8, 1996. According to the debtors' schedules filed shortly thereafter, the only real property owned by the debtors is their home which is located on six acres of land. The schedules indicate that the house and acreage together have a current market value of $50,-000.00, subject to a first mortgage held by Home Federal Bank ("Home Federal") in the amount of $42,000.00 and a second mortgage held by Appalachian Real Estate ("Appalachian") in the amount of $13,000.00. The debtors' proposed chapter 13 plan provides for continued maintenance payments to Home Federal on the first mortgage with the arrearage owed to Home Federal to be paid in full at the rate of $60.00 per month. With respect to the second mortgage held by Appalachian, however, the debtors seek to "cramdown" the mortgage to the difference between the value of the debtors' real property and the amount of the first mortgage ($50,000.00—$42,000.00). The plan proposes for Appalachian to retain its lien and to be paid a value of $8,000.00 at $175.00 per month plus 9% interest, with the remainder

Alan C. Lee, Morristown, Tennessee, for Brian Young and Ruth A. Young.

Mark A. Cowan, Bacon, Jessee, Perkins & Swanson, Morristown, Tennessee, for Appalachian Real Estate.

**1.** The process whereby a secured claim is "written down" under 11 U.S.C. § 1325(a)(5)(B) is sometimes referred to as a "cramdown" because a secured creditor is forced to accept secured

status under the plan only to the extent of the value of the collateral. *U.S. v. Arnold,* 878 F.2d 925, 928 (6th Cir.1989), *rehearing denied* (1989).

of Appalachian's claim to be paid in accordance with the proposed treatment of unsecured claims. Prepetition allowed unsecured claims will receive the greater of 20% or funds available, with the debtors making monthly payments into the plan of $820.00 for sixty months.

Appalachian objected to the plan contending that the debtors' proposed treatment of its claim impermissibly modifies the claim in violation of 11 U.S.C. § 1322(b)(2) which prohibits the modification of claims that are secured "only by a security interest in real property that is the debtor's principal residence." In the alternative, Appalachian maintained that the debtors' real property is worth more than $50,000.00 and that, accordingly, the debtors have undervalued Appalachian's interest in the debtors' home. The debtors responded that their valuation is correct and that modification of Appalachian's claim is authorized by 11 U.S.C. § 1322(c)(2) because final payment of the Appalachian mortgage falls due prior to the completion of the debtors' proposed five-year plan.

A hearing on the objection was held on June 4, 1996, wherein the court found that the value of the debtors' real property was $55,000.00. By the time of the hearing, Home Federal had filed a proof of claim which indicated that the amount owed on the first mortgage as of the date of the filing of the petition was $43,573.54. Thus, to the extent that Appalachian's second mortgage can be reduced to the difference between the value of the residence and the first mortgage, Appalachian is secured to the extent of $11,426.46. Because the debtors' proposed plan provides for a value of only $8,000.00, the court sustained the objection of Appalachian as to value. The court reserved, however, the issue of whether § 1322(c)(2) of the Bankruptcy Code permits modification of Appalachian's claim as proposed by the debtors and requested that the parties file memoranda of law on the issue. Briefs having now been filed, the issue is ready to be resolved by the court.

## II.

The initial starting point in construing a statute, of course, is the language of the statute itself, which is presumed to be used in its ordinary and usual sense. *Baum v. Madigan,* 979 F.2d 438, 441 (6th Cir.1992), *on remand, Baum v. Espy,* 840 F.Supp. 493 (N.D.Ohio 1993), *judgment vacated and appeal dismissed,* 48 F.3d 1219 (6th Cir.1993). *See also In re Sims,* 185 B.R. 853, 863 (Bankr.N.D.Ala.1995), *citing Caminetti v. U.S.,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917) ("[T]he meaning of a statute must, in the first instance be sought in the language in which the act is framed and if that is plain, ... the sole function of the courts is to enforce it according to its terms."). 11 U.S.C. § 1322(c)(2), the statute which the debtors cite as authority for their proposed treatment of Appalachian's claim, provides the following:

(c) Notwithstanding subsection (b)(2) and applicable nonbankruptcy law—

    . . . .

(2) in a case in which the last payment on the original payment schedule for a claim secured only by a security interest in real property that is the debtor's principal residence is due before the date on which the final payment under the plan is due, the plan may provide for the payment of the claim as modified pursuant to section 1325(a)(5) of this title.

A plain reading of this provision indicates that a plan may modify pursuant to § 1325(a)(5) a claim secured solely by the debtor's principal residence [hereinafter referred to as a "home mortgage"] if the last regularly scheduled payment under the claim falls due before final payment under the plan is due, notwithstanding 11 U.S.C. § 1322(b)(2) or any contrary applicable nonbankruptcy law. Section 1322(b)(2) of the Bankruptcy Code provides the general authority for modification of secured and unsecured claims, although such authority is subject to subparts (a) and (c) of § 1322 and one important exception: the rights of home mortgage claim holders may not be modified.

(b) Subject to subsections (a) and (c) of this section, the plan may—

    . . . .

(2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims.

11 U.S.C. § 1322(b)(2).

11 U.S.C. § 1322(c) indicates that the claim described therein may be modified "[n]otwithstanding subsection (b)(2)," and because § 1322(b) has been made expressly subject to subpart (c), it is logical to conclude that subsection (c)(2) provides an exception to the general prohibition on home mortgage modifications for those mortgages where the last payment happens to fall due during the life of the plan. The courts construing subsection (c)(2) since its enactment in 1994 have uniformly agreed. *See In re Sarkese,* 189 B.R. 531, 535 (Bankr.M.D.Fla.1995) (subsection 1322(c)(2) creates an exception to subsection 1322(b)(2)); *In re Lobue,* 189 B.R. 216, 218 (Bankr.S.D.Fla.1995) ("The plain language of Section 1322(c) clearly and explicitly ... removes the protection against the modification of certain mortgages...."); *In re Jones,* 188 B.R. 281, 282 (Bankr.D.Or. 1995) ("these provisions [subsection (c)(1) and (2)] create further exceptions to the § 1322(b)(2) prohibition against modification of the rights of secured creditors holding only liens against the debtor's residence."). Furthermore, the Supreme Court has recognized, in a discussion of the limits on § 1322(b)(2)'s protection for home mortgages, that similar "notwithstanding (b)(2)" language found in 1322(b)(5) prefaced an exception to this protection.[2] This court sees no statutory basis for concluding that one "notwithstanding" provision constitutes an exception to § 1322(b)(2), yet another does not.

■ Appalachian does not deny that its mortgage falls within the scope of § 1322(c)(2), that is, the last regularly scheduled payment under the mortgage will fall due during the life of the debtors' chapter 13 plan, or that § 1322(c)(2) permits the modification of its mortgage pursuant to § 1325(a)(5). Appalachian contends, however, that modification under § 1325(a)(5) consists only of adjustments in the term of the mortgage, the amount of periodic payments or whatever changes may be necessary to cure a home mortgage default and that it does not include the ability to bifurcate an undersecured claim into its secured and unsecured components pursuant to § 506(a) of the Bankruptcy Code as the debtors seek to do. Appalachian notes that § 1322(c)(2) makes no reference to § 506(a) and observes that the legislative history to § 1322(c)(2) indicates that the purpose of the provision was to permit the cure of short-term mortgages which matured or ballooned prepetition. The debtors' interpretation of § 1322(c)(2), asserts Appalachian, would overrule the U.S. Supreme Court's ruling in *Nobelman* with respect to short-term mortgages despite there being nothing in the legislative history indicating that such a result was the intent of Congress.

■ Appalachian's attempt to narrowly restrict the modification authority of § 1325 is without support. The very essence of a § 1325(a)(5) modification is the write down or "cramdown" of a secured claim to the value of the collateral securing the debt. *Arnold,* 878 F.2d at 928 ("Under this section [1325(a)(5)], the debtor can "cramdown" a plan repaying only the 'allowed secured claim,' *i.e.,* the amount of the debt to the extent it is secured by the present value of collateral taken by the creditor."); 2 KEITH M. LUNDIN, CHAPTER 13 BANKRUPTCY § 5.46 (2d ed. 1994). Section 1325(a)(5) is the authority for the typical chapter 13 treatment

---

**2.** In *Nobelman,* the court observed that the contractual rights of a home mortgage lender are not completely unaffected by the mortgagor's chapter 13 bankruptcy:

The lender's power to enforce its rights—and, in particular, its right to foreclose on the property in the event of default—is checked by the Bankruptcy Code's automatic stay provision. 11 U.S.C. § 362. *See United Savings Assn. of*

*Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 369–370, 108 S.Ct. 626, 629–630, 98 L.Ed.2d 740 (1988). In addition, § 1322(b)(5) permits the debtor to cure prepetition defaults on a home mortgage by paying off arrearages over the life of the plan "notwithstanding" the exception in § 1322(b)(2). *Nobelman,* 508 U.S. at 330, 113 S.Ct. at 2110.

of undersecured claims of paying the secured creditor the present value of its collateral (most often automobiles) and stripping the lien from the portion of the claim that exceeds that value. As the following analysis indicates, the court finds no statutory basis for treating undersecured home mortgages that fall due before the end of the plan differently now that the protection for these types of debts has been eliminated by § 1322(c)(2).

■ Section 1325(a) of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 13 plan, with subsection (a)(5) specifying the permissible treatment for secured claims.[3] This subsection offers a debtor three options for the treatment of secured claims: (1) convince the holder of the secured claim to accept the treatment proposed by the debtor [subsection (a)(5)(A)]; (2) provide in the plan that the holder of the secured claim retains its lien and will be paid not less than the present value of the allowed amount of its secured claim [subsection (a)(5)(B)(i) and (ii)]; or (3) surrender the collateral to the holder of the claim [subsection (a)(5)(C)]. *See In re Wilson,* 174 B.R. 215, 218 (BANKR.S.D.MISS.1994); 2 KEITH M. LUNDIN, CHAPTER 13 BANKRUPTCY § 5.42 (2d ed. 1994). If a secured creditor does not agree to the treatment offered it by a chapter 13 debtor and the proposed plan does not provide for the collateral to be surrendered, the debtor's treatment of the secured creditor's claim must meet the requirements of § 1325(a)(5)(B) in order for the plan to be confirmed. Conversely, if the mandates of

§ 1325(a)(5)(B) have been established, a plan can be confirmed over the secured creditor's objection, subject to all other requirements of confirmation being met. *Arnold,* 878 F.2d at 928; *General Motors Acceptance Corporation v. Jones,* 999 F.2d 63, 66 (3rd Cir.1993).

■ Although § 1325(a)(5)(B) does not define the phrase "allowed amount of the secured claim," the legislative history to § 1325 indicates that this determination is to be made in accordance with 11 U.S.C. § 506(a).[4] Section 506 of the Bankruptcy Code along with the other general provisions contained in chapters 1, 3 and 5 of the Code apply in chapter 13 cases[5] and reference to § 506(a) in determining an allowed secured claim for purposes of § 1325(a)(5)(B) has been universally accepted. *See Nobelman,* 508 U.S. at 328, 113 S.Ct. at 2110 ("Petitioners were correct in looking to § 506(a) for a judicial valuation of the collateral to determine the status of the bank's secured claim."); *U.S. v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 238–39, 109 S.Ct. 1026, 1029, 103 L.Ed.2d 290 (1989), *on remand,* 872 F.2d 778 (6th Cir.1989) ("Section 506 ... governs the definition and treatment of secured claims.... [and] provides that a claim is secured only to the extent of the value of the property on which the lien is fixed; the remainder of that claim is considered unsecured."); *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 371, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988) ("Section 506 of the Code defines the amount of the secured creditor's allowed secured claim...."); *In re Dins-*

**3.**    (a) Except as provided in subsection (b), the court shall confirm a plan if—

   . . . .

   (5) with respect to each allowed secured claim provided for by the plan—
   (A) the holder of such claim has accepted the plan;
   (B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or
   (C) the debtor surrenders the property securing such claim to such holder; . . . .
   11 U.S.C. § 1325(a)(5).

**4.**  The House Report accompanying the legislation provided in part the following:

With respect to secured claims provided for by the plan, the holder of the claim must have accepted the plan, or the debtor must either distribute under the plan the value, as of the effective date of the plan, to the holder of the claim, property of a value that is not less than the allowed amount of the secured claim, as determined under proposed 11 U.S.C. 506(a), or the debtor must surrender the property securing the claim to the holder of the claim. H.R.REP. No. 595, 95th Cong., 1st Sess. 430 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6385.

**5.**  "Except as provided in section 1161 of this title, chapters 1, 3, and 5 of this title apply in a case under chapter 7, 11, 12, or 13 of this title." 11 U.S.C. § 103(a).

*more,* 141 B.R. 499, 508 (Bankr.W.D.Mich. 1992) ("The words, 'allowed secured claim,' have been consistently interpreted to mean the value of the creditor's claim determined by reference to the collateral under § 506(a).").

■■ 11 U.S.C. § 506(a) [6] indicates that a claim secured by property of the estate is deemed an allowed secured claim only to the extent of the value of the collateral on which the lien is fixed; to the extent the amount of the claim exceeds the value of the collateral, it is unsecured. *Ron Pair,* 489 U.S. at 238–39, 109 S.Ct. at 1029; 5 COLLIER ON BANKRUPTCY ¶ 1325.06 (15 ed. 1996). An example provided by the treatise COLLIER ON BANKRUPTCY, quoted with approval by the U.S. Supreme Court in *Ron Pair,* illustrates § 506(a)'s result. "Thus, a $100,000 claim, secured by a lien on property of a value of $60,000, is considered to be a secured claim to the extent of $60,000, and to be an unsecured claim for $40,000." *Ron Pair,* 489 U.S. at 240, 109 S.Ct. at 1029, n. 3, *citing* 3 COLLIER ON BANKRUPTCY 506.04, p. 506–15 (15th ed. 1988) ("[S]ection 506(a) requires a bifurcation of a 'partially secured' or 'undersecured' claim into separate and independent secured claim and unsecured claim components.").

■■ Applying § 506(a)'s formula for ascertaining "allowed secured claim" to § 1325(a)(5)(B)(ii)'s requirement that a secured creditor be paid the present value of its allowed secured claim establishes that the creditor must be paid the present value of the collateral on which it has a lien. *Arnold,* 878 F.2d at 928; *Landmark Financial Services v. Hall,* 918 F.2d 1150, 1154 (4th Cir. 1990). "Any indebtedness due the creditor in excess of the value of the collateral is included with other allowed unsecured claims." *Arnold,* 878 F.2d at 928.

■■ Appalachian's attempt to separate the process under § 1325(a)(5) from the valuation or bifurcation of the secured claim

under § 506(a) assumes that these are two separate and alternative methods of treating secured claims. They are not. Section 1325(a)(5)(B) alone sets forth the requisite treatment of a secured claim necessary to overcome the claim holder's objection and it is § 1325(a)(5)(B), not § 506(a), which provides the authority for the "cramdown." *In re Montgomery Court Apartments of Ingham County, Ltd.,* 141 B.R. 324, 350 (Bankr. S.D.Ohio 1992). Section 506(a) simply governs the allowance process for the secured status of a claim by supplying the method or formula for valuation, the result of which is bifurcation or separation of the secured claim into its secured and unsecured components. *Id.* This bifurcation would have no effect on payment or treatment of the secured claim but for the authority given a debtor under § 1325(a)(5) to "cramdown" the claim to its allowed secured amount. The result in *Nobelman* illustrates this principle. The Supreme Court in *Nobelman* acknowledged that the chapter 13 debtor therein was correct in looking to § 506(a) for a determination of the bank's secured claim based on the value of its collateral, but found that the bank's treatment could not be limited pursuant to § 1325(a)(5) by this valuation due to the protection of home mortgages provided by § 1322(b)(2). *Nobelman,* 508 U.S. at 328–30, 113 S.Ct. at 2110.

■■ Recognition of the distinction in these concepts is not to minimize the role of § 506(a) in the "cramdown" process. Valuation of the allowed secured claim pursuant to § 506(a) is the first step in a "cramdown" under § 1325(a)(5) and thus, is integral to the process. *In re Wilson,* 174 B.R. at 218 n. 2. Because of this interaction, it is irrelevant that § 1322(c)(2) does not refer to § 506(a) when it states that a claim can be modified under § 1325(a)(5). Reference to § 1325(a)(5) alone, by definition, will result in application of § 506(a).

**6.** 11 U.S.C. § 506(a) states in part the following: An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to set off is less than the amount of such allowed claim.

The U.S. Supreme Court's decision in *Dewsnup v. Timm* has no effect on this analysis. In *Dewsnup*, the court held that a debtor in a chapter 7 case could not use § 506(d) [7] of the Code to strip down a lien to the extent the creditor's claim exceeded the value of its collateral. *Dewsnup v. Timm*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992). Section 506(d) provides that a lien securing a claim against the debtor is void to the extent it is not an allowed secured claim, subject to certain exceptions. The *Dewsnup* court found § 506(d) ambiguous and refused to depart from the traditional pre-Code rule in liquidation cases that liens pass through bankruptcy unaffected, absent some indication in the legislative history that this was Congress' intent. *Id.* at 415–420, 112 S.Ct. at 777–79. The Supreme Court expressly limited its ruling to liquidation cases [8] and attempts to apply *Dewsnup* to reorganization cases have been uniformly rejected. *See Wade v. Bradford*, 39 F.3d 1126 (10th Cir. 1994); *Sapos v. Provident Institution of Savings*, 967 F.2d 918, 921 (3rd Cir.1992); *In re Eastwood*, 192 B.R. 96 (Bankr.D.N.J.1996); *In re Scheierl*, 176 B.R. 498 (Bankr.D.Minn. 1995); *In re Hernandez*, 175 B.R. 962 (N.D.Ill.1994), *overruling* 162 B.R. 160 (Bankr.N.D.Ill.1993); *In re Wilson*, 174 B.R. at 215; *McDonough v. Plaistow Cooperative Bank (In re McDonough)*, 166 B.R. 9 (Bankr.

D.Mass.1994); *Gibbons v. Opechee Distributors, Inc. (In re Gibbons)*, 164 B.R. 717 (Bankr.D.N.H.1993); *Dever v. IRS (In re Dever)*, 164 B.R. 132 (Bankr.C.D.Cal.1994); *Ford Motor Credit Co. v. Lee (In re Lee)*, 162 B.R. 217 (D.Minn.1993); *Hirsch v. Citicorp Mortgage Corp. (In re Hirsch)*, 155 B.R. 688 (Bankr.E.D.Pa.1993), *vacated on other grounds by* 166 B.R. 248 (E.D.Pa.1994); *In re Leverett*, 145 B.R. 709 (Bankr.W.D.Okla. 1992); *In re Dinsmore*, 141 B.R. at 499.

These courts have recognized, as the Supreme Court impliedly observed, that *Dewsnup's* premise that pre-Code law did not permit the voluntary reduction of the amount of a creditor's lien does not apply to reorganization cases. *See Wade v. Bradford*, 39 F.3d at 1128, *quoting Dewsnup*, 502 U.S. at 418–419, 112 S.Ct. at 779 ("Apart from reorganization proceedings ... no provision of the pre-Code statute permitted involuntary reduction of the amount of a creditor's lien for any reason other than payment on the debt."). Furthermore, unlike the legislative history of § 506(d), the legislative history of § 1325(a)(5) unequivocally establishes Congress' intent to permit the bifurcation and modification of a creditor's lien.[9] *See In re McDonough*, 166 B.R. at 13 ("[I]n the ... legislative history [to § 1325], this court finds in Chapter 13 cases the crucial nexus be-

---

**7.** 11 U.S.C. § 506(d) provides:
To the extent that a lien secures a claim against the debtor that is not allowed secured claim, such lien is void, unless—
(1) such claim was disallowed only under section 502(b)(5) or 502(e) of this title; or (2) such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under section 501 of this title.

**8.** In *Dewsnup*, the court stated as follows:
"[Section] 506 of the Bankruptcy Code and its relationship to other provisions of that Code do embrace some ambiguities. [Citation omitted]. Hypothetical applications that come to mind and those advanced at oral argument illustrate the difficulty of interpreting the statute in a single opinion that would apply to all possible fact situations. We therefore focus upon the case before us and allow other facts to await their legal resolution on another day."
*Dewsnup*, 502 U.S. at 416–417, 112 S.Ct. at 778.

**9.** *Compare* H.R.Rep. No. 595, 95th Cong., 1st Sess. 357 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6313 ("Subsection (d) [of § 506] permits

liens to pass through the bankruptcy case unaffected.") with n. 4 *supra* and the following:

Section 1325(a)(5)(B) of the House amendment modifies the House bill and Senate amendment to significantly protect secured creditors in chapter 13. Unless the secured creditor accepts the plan, the plan must provide that the secured creditor retain the lien securing the creditor's allowed secured claim in addition to receiving value, as of the effective date of the plan of property to be distributed under the plan on account of the claim not less than the allowed amount of the claim.... Of course, the secured creditors' lien only secures the value of the collateral and to the extent property is distributed of a present value equal to the allowed amount of the creditor's secured claim the creditor's lien will have been satisfied in full. Thus the lien created under section 1325(a)(5)(B)(i) is effective only to secure deferred payments to the extent of the amount of the allowed secured claim.
124 Cong.Rec. H11,107 (daily ed. Sept. 28, 1978).

tween the modification of secured claims and § 506(a)'s definition of 'allowed secured claim,' which nexus the *Dewsnup* Court could not find in the Chapter 7 context.").

Many courts have recognized the catastrophic consequences of applying *Dewsnup's* holding to a chapter 13 case. As stated by one bankruptcy court:

> [To bar lien stripping] would in essence, gut the sum and substance of the reorganization and rehabilitation of debt concept under the Bankruptcy Code. In such cases, the Debtor would propose a plan for repayment of creditors to the extent of the value of the property securing the creditor's claim, but would still owe the unsecured portion of the claim, post-confirmation, in order to obtain a release of the lien on said property. This would require all plans filed under chapters 11, 12 and 13 to pay all creditors one hundred percent of their claims in order for the debtor to emerge from bankruptcy with a "fresh start." Clearly, this has never been the purpose...."

*In re Butler*, 139 B.R. 258, 259 (Bankr. E.D.Okla.1992). *See also In re Lee*, 162 B.R. at 223 ("[A] holding that strip down is never available in Chapter 13 cases would ... defeat one of the primary purposes of Chapter 13, which is to offer debtors an incentive to gradually repay their obligations rather than to liquidate their assets under Chapter 7."); *In re Wilson*, 174 B.R. at 222 (to deny lien stripping in chapter 13 would be ignoring case law, statutory text, and intent of Congress in creating chapter 13); *In re McDonough*, 166 B.R. at 12 ("[I]t is clear that ... lien reduction is at the very foundation of reorganization under [chapter 13]."); *In re Leverett*, 145 B.R. at 713, ("The survival of all liens would preclude the finality necessary to the success of such rehabilitative efforts, and would render § 506(a) virtually meaningless in [chapter 12 and 13] cases.").

Literal application of § 1322(c)(2) as construed by this court will, of course, overrule *Nobelman* with respect to any home mortgage whose remaining term is less than the life of the chapter 13 plan, as Appalachian charges. In *Nobelman*, the Supreme Court held that § 1322(b)(2) prohibited the bifurca-

tion of an undersecured home mortgage holder's claim into its secured and unsecured components. *See Nobelman*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993). Prior to that ruling, there existed a split of authority concerning whether the exception in § 1322(b)(2) prohibiting the modification of home mortgages applied only to the extent the home mortgage was secured as determined by § 506(a) such that any unsecured portion of a home mortgage could be modified. A unanimous Supreme Court rejected this analysis, concluding that such a bifurcation was a modification of the rights of home mortgage holders in violation of § 1322(b)(2). *Id.*

*Nobelman* was based solely on the prohibition on home mortgage modification set forth in § 1322(b)(2). As stated by the court:

> [T]o give effect to § 506(a)'s valuation and bifurcation of secured claims through a Chapter 13 plan in the manner petitioners propose would require a modification of the rights of the holder of the security interest. Section 1322(b)(2) prohibits such a modification where, as here, the lender's claim is secured only by a lien on the debtor's principal residence.

*Nobelman*, 508 U.S. at 332, 113 S.Ct. at 2111. The contrary implication is clear: absent § 1322(b)(2)'s protection, "cramdown" of an undersecured home mortgage under § 1325(a)(5)(B) would be permitted. *In re McDonough*, 166 B.R. at 12. Furthermore, nothing in the opinion suggests that bifurcation, "cramdown" or lien stripping in general in a chapter 13 case is inappropriate. *In re Cooke*, 169 B.R. 662, 666 (Bankr.W.D.Mo. 1994) ("*Nobelman* did not prohibit all lien stripping in Chapter 13, nor did the Supreme Court refer to *Dewsnup* in *Nobelman*."); David Gray Carlson, *Bifurcation of Undersecured Claims In Bankruptcy*, 70 AM.BANKR. L.J. 1, 119 n. 157 (Winter 1996) ("Nothing in the *Nobelman* decision suggests that bifurcation in general is inappropriate.").

Appalachian questions whether Congress would enact legislation overruling, even in part, a U.S. Supreme Court decision without some indication of this intent in the legislation's history. There is support for this posi-

tion. As noted above, the Supreme Court in *Dewsnup* expressed its reluctance to render any interpretation of the Bankruptcy Code that would "effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history," observing that "when Congress amends the bankruptcy laws, it does not write 'on a clean slate.' " *Dewsnup*, 502 U.S. at 419, 112 S.Ct. at 779.

Appalachian is correct that the legislative history to § 1322(c)(2) gives no indication that Congress intended to reverse any aspect of *Nobelman*, nor is bifurcation or "cramdown" even addressed. Section 1322(c) in its present form [10] was enacted as a part of the Bankruptcy Reform Act of 1994 which became law on October 22, 1994, some sixteen months after the Supreme Court rendered its decision in *Nobelman*. The first subpart of § 1322(c) provides that any default in a lien on the debtor's principal residence may be cured until such time as the residence is sold at a foreclosure sale, notwithstanding § 1322(b)(2)'s protection of home mortgages or any contrary applicable nonbankruptcy law. The legislative history evidences that the purpose of this provision was to overrule the result in *Matter of Roach*, 824 F.2d 1370 (3rd Cir.1987), which had held, contrary to previous rulings by other circuits, that the debtor's right to cure was extinguished at the time of the foreclosure judgment, an event which occurs in advance of the foreclosure sale.

With respect to subpart (c)(2), the legislative history states only that its enactment will overrule the Third Circuit case of *First National Fidelity Corp. v. Perry*, 945 F.2d. 61 (3rd. Cir.1991), *rehearing denied* (1991),

wherein a chapter 13 debtor had attempted to pay in full over the life of his plan a foreclosure judgment which had been obtained against him prepetition.[11] The *Perry* court had rejected the proposed plan, concluding that confirmation of such a plan over the claim holder's objection would modify the rights of the holder of a claim secured only by the debtor's principal residence in violation of 11 U.S.C. § 1322(b)(2), since the foreclosure judgment turned the loan into one requiring immediate full payment. *Perry*, 945 F.2d at 65.

The bankruptcy court in *Jones* commented that reference to *Perry*, as support for § 1322(c)(2)'s enactment, is puzzling. *See In re Jones*, 188 B.R. at 282–284 (setting forth detailed account of the legislative history of § 1322(c)(2)). Section 1322(c)(2) addresses the permissible treatment of a home mortgage claim in cases where the last payment under the terms of the parties' original contract falls due before the end of the plan. *Perry*, however, involved a prepetition default and foreclosure judgment, with the debtor filing chapter 13 to stop the foreclosure sale. There is nothing in *Perry* indicating that the mortgage debt at issue therein would have matured under the original terms of the parties' contract during the life of the debtors' proposed plan. *Id.* at 283. Nor do any facts of *Perry* shed light on the bifurcation question because the loan in *Perry* was fully secured and the debtor was simply seeking to pay the mortgage in full. The lack of correlation between the *Perry* case and the language of § 1322(c)(2) led the *Jones* court to conclude that there is no legislative history for § 1322(c)(2). *Id.* At

---

10. Section 301 of the Reform Act moved the old subsection (c) of § 1322 to (d) and created the present subsection (c) with its two subparts. *See* Bankruptcy Reform Act of 1994, Pub.L. No. 103–394, § 301, 108 Stat. 4106; *In re Sarkese*, 189 B.R. at 534–35; *In re Sims*, 185 B.R. at 856.

11. In this regard, the legislative history to Sec. 301 of the 1994 Bankruptcy Reform Act provides in pertinent part as follows:
The changes made by this section, in conjunction with those made in section 305 of this bill, would also overrule the result in *First National Fidelity Corp. v. Perry*, 945 F.2d 61 (3rd Cir. 1991) with respect to mortgages on which the

last payment on the original payment schedule is due before the date on which the final payment under the plan is due. In that case, the Third Circuit held that subsequent to foreclosure judgment, a chapter 13 debtor cannot provide for a mortgage debt by paying the full amount of the allowed secured claim in accordance with Bankruptcy Code section 1325(a)(5), because doing so would constitute an impermissible modification of the mortgage holder's right to immediate payment under section 1322(b)(2) of the Bankruptcy Code.
140 Cong.Rec. H10,769 (daily ed., Oct. 4, 1994).

a minimum, the legislative history is inconclusive.

■ The absence of clarity in § 1322(c)(2)'s legislative history and the lack of any indication therein evidencing an intent to overrule *Nobelman* is not determinative. The Supreme Court's refusal in *Dewsnup* to apply a particular meaning to § 506(d) based on the lack of clear legislative intent came into play in interpreting an ambiguous statute. The court expressly noted, however, that "where the language is unambiguous, silence in the legislative history can not be controlling." *Dewsnup*, 502 U.S. at 419–420, 112 S.Ct. at 779. Instead, "judicial inquiry is complete," *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 254, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992), *on remand*, 988 F.2d 1323 (2nd Cir.1993); and "the sole function of the courts is to enforce [the plain language of the statute] according to its terms." *In re Sims*, 185 B.R. at 864, *quoting Caminetti*, 242 U.S at 485, 37 S.Ct. at 194; *Ron Pair*, 489 U.S. at 240–41, 109 S.Ct. at 1030 (If a "statutory scheme is coherent and consistent, there is generally no need for a court to inquire beyond the plain meaning of the statute."). The plain meaning of legislation is conclusive "except in the 'rare cases in which the literal application of a statute would produce a result demonstrably at odds with the intention of its drafters.'" *Ron Pair*, 489 U.S. at 242, 109 S.Ct. at 1031, *quoting Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982).

Literal application of § 1322(c)(2) in the manner proposed by the debtors does not produce a result that is "demonstrably at odds with the intention of the drafters." Instead, it only produces a result for which there is no expressed intent in the statute's legislative history. Because § 1322(c)(2)'s plain meaning does not conflict with any stated intention of Congress or run counter to any other section of the Bankruptcy Code, the statute must be applied as written. *See Nixon v. Kent County*, 76 F.3d 1381, 1386 (6th Cir.1996), *quoting Reves v. Ernst & Young*, 507 U.S. 170, 177, 113 S.Ct. 1163, 1169, 122 L.Ed.2d 525 (1993) ("[I]f the statutory language is unambiguous, in the absence of a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.").

■ This court realizes that the literal application of § 1322(c)(2) will permit the "cramdown" of not only short-term home mortgages (less than five years) and balloon payments, but also the traditional long-term mortgages (15, 20, 25, or 30 years) which have less than five years remaining under the terms of the loan.[12] However, if Congress had intended to limit § 1322(c)(2) to short-term mortgages or to short-term mortgages that balloon or mature prepetition as Appalachian contends, it could have simply stated so. Congress did not.

Although this is a case of first impression for the courts, the extent of § 1322(c)(2) has been considered by legal commentators who have uniformly recognized the full impact of § 1322(c)(2)'s enactment. 5 COLLIER ON BANKRUPTCY ¶ 1322.14B (15th ed. 1996) (§ 1322(c)(2) overrules *Nobelman* for certain home mortgages since *Nobelman* was based solely on § 1322(b)(2) to which § 1322(c) is an exception); Marianne B. Culhane, *Home Improvement? Home Mortgages and the Bankruptcy Reform Act of 1994*, 29 CREIGHTON L.REV. 467, 490 (1996) (the plain language of § 1322(c)(2) would allow lien stripping of mortgages falling within its context, although it is unclear whether this was Congress' intent); Julia Patterson Forrester, *Mortgaging the American Dream: A Critical Evaluation of the Federal Government's Promotion of Home Equity Financing*, 69 TUL.L.REV. 373, 451 (Dec.1994) (§ 1322(c)(2) will permit lien stripping of a short term home equity loan in those cases in which the amount of the debt exceeds the value of the

---

**12.** Application of § 1322(c)(2) could produce the seemingly inequitable result that a long-term mortgage with five years and one month remaining could not be modified, but a long-term mortgage with four years and eleven months remaining could. The practical impact of § 1322(c)(2) on long-term mortgages, however, is limited. In a typical 20 or 30 year first mortgage, the balance remaining in the last five years of the mortgage will almost always be fully secured and thus, not susceptible to bifurcation. Walter J. Taggart, *An Introduction to the Bankruptcy Reform Act of 1994*, 41 No. 2 PRAC.LAW 55 (March 1995).

654

home); Walter J. Taggart, *An Introduction to the Bankruptcy Reform Act of 1994*, 41 No. 2 PRAC.LAW. 55 (March 1995) (because § 1322(c)(2) provides that "stub" mortgages may be modified pursuant to § 1325(a)(5), the basic provision governing how a chapter 13 plan must treat allowed secured claims, the lien on the unsecured portions of these types of loans will be stripped).

### III.

This court having determined that the value of the collateral in which Appalachian has an interest is $11,426.46 (the difference between the value of the debtors' real property and the amount of the first mortgage) and that § 1322(c)(2) permits the modification of Appalachian's claim with a resulting cramdown to this value, upon the debtors' modification of their chapter 13 plan to pay the present value of $11,426.46 to Appalachian over the life of the plan, the requirements of § 1325(a)(5)(B) will have been met. Accordingly, Appalachian's objection must be overruled.

The foregoing constitutes the court's findings of facts and conclusions of law pursuant to Fed.R.Civ.P. 52(a), as incorporated by Fed.R.Bankr.P. 7052. An order will be entered in accordance with this memorandum opinion.