**In re Brenda Kay SEXTON, Debtor.**

**Bankruptcy No. 98–33915.**

United States Bankruptcy Court,
E.D. Tennessee.

Feb. 1, 1999.

Richard M. Mayer, Knoxville, Tennessee, for debtor.

Testerman, Warren & Roden, Stanley F. Roden, Knoxville, Tennessee, for American General Finance, Inc.

Gwendolyn M. Kerney, Knoxville, Tennessee, Chapter 13 Trustee.

## *MEMORANDUM*

RICHARD S. STAIR, Jr., Chief Judge.

On September 1, 1998, the Debtor, Brenda Kay Sexton, filed the petition commencing this Chapter 13 case together with her Chap-

ter 13 Plan. She filed an Amended Chapter 13 Plan on October 26, 1998. An Objection to Confirmation by Creditor, American General Finance, Inc. (American General), was filed on November 3, 1998. A trial was held on January 6, 1999, to determine the following issues: (1) Whether the Debtor's Plan meets the confirmation requirement of 11 U.S.C.A. § 1325(a)(1) (West 1993); specifically, whether the Debtor's Plan violates the provisions of 11 U.S.C.A. § 1322(b)(2) (West 1993) in that it purports to modify the claim of American General Finance, Inc. which is secured only by a security interest in real property that is the Debtor's principal residence? (2) Whether the Debtor's Plan meets the confirmation requirement of good faith mandated by 11 U.S.C.A. § 1325(a)(3) (West 1993)? The evidence consists of the testimony of the Debtor and George Hannah, the Assistant Manager of American General, and nine exhibits all of which were stipulated by the parties.

This is a core proceeding. 28 U.S.C.A. § 157(b)(2)(L) (West 1993).

## I

At the trial the parties stipulated to the following facts: The Debtor's principal place of residence is located at 313 Basilfield Drive in Knoxville, Tennessee. The value of that residence for the purpose of this contested matter is $97,500.00. Norwest Mortgage hold a first mortgage on the property to secure a debt with a balance of $95,322.88. Union Planters Bank holds a second mortgage to secure a home equity line of credit, on which the Debtor owes $4,334.41. A third mortgage held by American General itemized by the Debtor in her plan at $5,518.98, has no value.

In May 1997, the Debtor needed new tires and other maintenance for her car and sought an $800.00 loan from American General. Mr. Hannah testified that American General, as a policy, does not accept third mortgages. As an alternative, American General offered to loan the Debtor enough money to meet her immediate needs and pay off her debt to Union Planters Bank, whose mortgage would then be released. In return, American General would receive a second mortgage. Mr. Hannah testified that throughout the course of these dealings, American General relied on the Debtor to provide it with account information regarding the Union Planters Bank line of credit.

The Debtor accepted American General's offer and the parties agreed to a loan in the principal amount of $10,022.20 to be secured by the Debtor's residence. On May 30, 1997, the Debtor signed a Note and a Deed of Trust with Assignment of Rents. Under the Note, the Debtor agreed to pay $234.66 monthly from July 4, 1997 to June 4, 2002. The proceeds of the loan were divided between Union Planters Bank, who received $6,361.74, and the Debtor, who received $900.68. Additionally, the sum of $2,737.58 was used to pay off a prior loan with American General and $22.20 represented a recording fee.

American General issued its check, dated June 4, 1997, made payable to the Debtor and Union Planters Bank in the amount of $6,361.74. The Debtor endorsed the check and it was then transmitted by American General to Union Planters Bank along with a letter signed by the Debtor and American General's manager, Greg Reed. The letter explained that the check was to pay off the Debtor's equity line of credit account and was conditioned on the termination of the line of credit and the release of Union Planters Bank's deed of trust securing the credit line. Union Planters Bank credited the Debtor's account for the $6,361.74 on or about June 16, 1997, but did not terminate the account, release its deed of trust, or notify American General of any discrepancy in the payoff amount.

Unknown to American General, transactions made by the Debtor using the account continued to accumulate in excess of the $6,361.74 amount which the Debtor had furnished to American General as the total amount of her debt to Union Planters Bank. Three statements from Union Planters Bank were entered as stipulated exhibits at the trial and showed the activity in the account from May 28, 1997 through August 12, 1997. The Debtor made the following additional transactions using the account: Convenience Check # 106 in the amount of $150.00 posted

on May 28, 1997; Convenience Check # 105 in the amount of $114.87 posted on June 4, 1997; a $3,000.00 cash advance posted on July 1, 1997; a $1,000.00 cash advance posted on July 16, 1997; a $500.00 cash advance posted on August 8, 1997; and a $500.00 cash advance posted on August 12, 1997. On August 1, 1997, the Debtor paid Union Planters Bank $64.30.

The Debtor made eight payments to American General under the May 30, 1997 Note. In February 1998, American General experienced difficulty in obtaining the Debtor's payments. On May 4, 1998, American General filed suit against the Debtor in the General Sessions Court for Knox County and obtained a judgment on May 27, 1998.

## II

■ The Debtor's amended Chapter 13 Plan provides for payment to the Chapter 13 Trustee of $650.00 each month for a term of sixty months. American General is treated as a nonpriority unsecured creditor who will receive the same dividend paid to all similarly situated creditors, 20% to 70%. American General asserts that such treatment violates Bankruptcy Code § 1322(b)(2), and that the court must therefore deny confirmation of the Debtor's plan under § 1325(a)(1), which requires that the plan comply with the provisions of Chapter 13 and the other applicable provisions of the Bankruptcy Code. *See* 11 U.S.C.A. § 1325(a)(1).

Code § 1322(b)(2) provides that a plan may,

> modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims[.]

11 U.S.C.A. § 1322(b)(2).

The "principal residence" exception carved out in § 1322(b)(2) has no application to the claim of American General in this case. Rather, because the last payment owing under the May 30, 1997 Note executed by the Debtor is due within the term of the Debtor's plan, the Debtor has chosen to treat Ameri-

can General's claim within the context of 11 U.S.C.A. § 1322(c)(2) (West Supp.1998).

Section 1322(c)(2), enacted as part of the Bankruptcy Reform Act of 1994, "defines a narrow class of claims to which [the 'principal residence' exception of subsection 1322(b)(2) ] do[es] not apply." *First Union Mortgage Corp. v. Eubanks (In re Eubanks)*, 219 B.R. 468, 477 (6th Cir. BAP 1998). Specifically, that subsection provides as follows:

> (c) Notwithstanding subsection (b)(2) and applicable nonbankruptcy law—
>
> . . . .
>
> (2) in a case in which the last payment on the original payment schedule for a claim secured only by a security interest in real property that is the debtor's principal residence is due before the date on which the final payment under the plan is due, the plan may provide for the payment of the claim as modified pursuant to section 1325(a)(5) of this title.

11 U.S.C.A. § 1322(c)(2).

Section 1322(c)(2) applies in the present case because the last payment on the Debtor's original payment schedule was due June 4, 2002, which falls well before the final payment date under the Debtor's sixty month plan. Pursuant to § 1322(c)(2), the Debtor's plan may, and does, provide for the payment of the claim as modified under 11 U.S.C.A. § 1325(a)(5)(B) (West 1993), the cram-down provision of Chapter 13. That section provides in material part that

> with respect to each allowed secured claim provided for by the plan—
>
> . . . .
>
> (B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and
>
> (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim[.]

11 U.S.C.A. § 1325(a)(5)(B).

■ With limited success, creditors relegated to treatment under § 1322(c)(2) have urged courts to decide that the reference in that subsection to § 1325(a)(5) does not per-

mit the bifurcation of claims but rather incorporates only the modification of the payment of a claim as permitted under § 1325(a)(5). *See, e.g., Witt v. United Companies Lending Corp. (In re Witt),* 113 F.3d 508 (4th Cir. 1997) (allowing modification of payment, but prohibiting bifurcation). The rationale for that view rests on a supposed ambiguity contained in § 1322(c)(2), which is whether "modification" modifies "payment" or "claim" or both. *See id.* at 511. To reach that decision, a court must take two steps. *See Eubanks,* 219 B.R. at 472. First, it must reject the doctrine of the last antecedent, which directs that " 'a phrase should be read to modify its immediate antecedent.' " *Id.* (quoting *Witt,* 113 F.3d at 511). Second, it must rely on the legislative history of § 1322(c)(2), which states that the subdivision was intended to overrule *First Nat'l Fidelity Corp. v. Perry,* 945 F.2d 61 (3rd Cir.1991). *See id.* In *Perry,* the Third Circuit held that, where a prepetition foreclosure judgment was entered and the creditor was entitled to immediate payment in full, § 1322(b)(2) prevented the debtor from exercising its power to cure defaults through a plan or provide for any payment other than immediate payment in full. *See id.*

In the Sixth Circuit, courts have repeatedly decided that § 1322(c)(2) permits debtors to bifurcate creditors' claims. *See id.; In re Young,* 199 B.R. 643 (Bankr.E.D.Tenn.1996). In *Eubanks,* a Sixth Circuit Bankruptcy Appellate Panel case, the court considered and rejected the rationale supporting the view that § 1322(c)(2) permits modification of payments only. *See Eubanks,* 219 B.R. at 472.

First, the court decided that the word "modified" does apply to the word "claim." *See id.* It noted that § 1322(c)(2) provides for the "payment of the claim as modified *pursuant to section 1325(a)(5)[.]" Id.* The court pointed out that bifurcation of claims pursuant to 11 U.S.C.A. § 506(a) (West 1993) is an integral part of § 1325(a)(5) and that Congress intended § 506(a) to apply to § 1322(c)(2) just as it ordinarily does throughout the Bankruptcy Code when reference is made to § 1325(a)(5). *See id.* at 473; *see also Young,* 199 B.R. at 647–48. In effect, unless otherwise provided, a reference to § 1325(a)(5) necessarily implicates § 506(a) because "the very essence of a § 1325(a)(5) modification is the write down or 'cramdown' of a secured claim to the value of the collateral securing the debt." *Young,* 199 B.R. at 647, 649.

Next the court examined the legislative history of § 1322(c)(2), after noting that such examination was actually not necessary because the language of that subdivision unambiguously requires courts to permit bifurcation of claims. *See Eubanks,* 219 B.R. at 473. After a thorough examination the court concluded that the legislative history supports the bifurcation of claims under § 1322(c)(2). *See id.* at 474; *Young,* 199 B.R. at 651–53. It is not necessary for this court to duplicate the able analysis of the legislative history that is contained in the *Eubanks* decision. *See Eubanks,* 219 B.R. at 473–79.

Finally, the court rejected the argument that allowing bifurcation of claims under § 1322(c)(2) will strip residential mortgagees of the protection with which Congress intended to provide to them under § 1322(b)(2). *See id.* at 479. It explained that § 1322(c)(2) applies most often to "short-term, high-interest rate home equity loans [which] are more akin to consumer financing than traditional home lending." *Id.* at 480. ("Rarely will this provision affect the holder of a traditional residential, long term mortgage[.]") Because § 1322(b)(2) was intended to protect traditional home lending rather than consumer financing, bifurcation of claims under § 1322(c)(2) does not obstruct the purpose of § 1322(b)(2). *See id.* at 480.

Following the precedent of *Eubanks* and *Young,* this court reads § 1322(c)(2) to permit the bifurcation of claims as provided by § 506(a). In this case, the value of the Debtor's residential property is less than the sum of the first and second mortgages against it. American General is the third mortgagee. There being no value in the collateral to secure American General's claim, the Debtor has properly crammed down American General pursuant to § 1325(a)(5)(B) to the value of its collateral, zero. As a result, the Debt-

or's plan may treat American General's claim as being exactly what it is, wholly unsecured.

## III

American General also asserts that the Debtor's plan should not be confirmed because Debtor lacks good faith under 11 U.S.C.A. § 1325(a)(3).

■ A good faith requirement is imposed upon Chapter 13 debtors by virtue of 11 U.S.C.A. § 1325(a)(3), which provides in material part:

> [T]he court shall confirm a plan if—
>
> . . . .
>
> (3) the plan has been proposed in good faith and not by any means forbidden by law[.]

11 U.S.C.A. § 1325(a)(3). The debtor who seeks a discharge under Chapter 13 bears the burden of proving that the plan has been proposed in good faith. *See Hardin v. Caldwell (In re Caldwell)*, 895 F.2d 1123, 1126 (6th Cir.1990).

■ "Good faith is an amorphous notion, largely defined by factual inquiry." *Metro Employees Credit Union v. Okoreeh–Baah (In re Okoreeh–Baah)*, 836 F.2d 1030, 1033 (6th Cir.1988). The good faith concept should be interpreted in accordance with the objectives and purposes of Chapter 13. *See State of Ohio, Student Loan Comm'n v. Doersam (In re Doersam)*, 849 F.2d 237, 239 (6th Cir.1988); *Okoreeh–Baah*, 836 F.2d at 1033. In making the good faith determination, courts must consider the totality of the circumstances surrounding the particular debtor in question. *See Society Nat'l Bank v. Barrett (In re Barrett)*, 964 F.2d 588, 591 (6th Cir.1992).

■ The Sixth Circuit has outlined a number of factors that are helpful in determining whether a debtor's plan is proposed in good faith:

1) the amount of income of the debtor and the debtor's spouse from all sources;

2) the regular and recurring living expenses for the debtor and his dependants;

3) the amount of the attorney's fees to be awarded in the case and paid by the debtor;

4) the probable or expected duration of the Chapter 13 plan;

5) the motivations of the debtor and his sincerity in seeking relief under the provisions of Chapter 13;

6) the ability of the debtor to earn and the likelihood of future increase or diminution of earnings;

7) special situations such as inordinate medical expense, or unusual care required for any member of the debtor's family;

8) the frequency with which the debtor has sought relief under any section or title of the Bankruptcy Reform Act or its predecessor's;

9) the circumstances under which the debtor has contracted his debts and his demonstrated bona fides, or lack of same, in dealing with his creditors;

10) whether the amount or percentage of payment offered by the particular debtor would operate or be a mockery of honest, hard-working, well-intended debtors who pay a higher percentage of their claims consistent with the purpose and spirit of Chapter 13;

11) the burden which the administration of the plan would place on the trustee; and

12) the salutary rehabilitative provisions of the Bankruptcy Reform Act of 1978 which are to be construed liberally in favor of the debtor.

*Okoreeh–Baah*, 836 F.2d at 1032 n. 3 (quoting *Georgia R.R. Bank & Trust Co. v. Kull (In re Kull)*, 12 B.R. 654, 659 (S.D.Ga.1981), aff'd sub nom. *In re Kitchens*, 702 F.2d 885 (11th Cir.1983)).

■ The guidance provided by that list should be viewed in light of the ultimate issue in a good faith inquiry, which is "whether there is 'a sincerely-intended repayment of pre-petition debt consistent with the debtor's available resources.'" *Barrett*, 964 F.2d at 592 (quoting *Okoreeh–Baah*, 836 F.2d 1030, 1033 (6th Cir.1988)); *Caldwell*, 895 F.2d at 1126 (6th Cir.1990). In the end, the good faith analysis relies more upon the common sense judgment of the bankruptcy court than any mechanical checklist. *See Okoreeh–Baah*, 836 F.2d at 1033.

To support its claim that confirmation should be denied to this Debtor for lack of good faith because she continued to use the account, American General asserts that the Debtor understood that termination of her Union Planters Bank line of credit was required and that American General required a second mortgage rather than a third mortgage.

Although, under the terms of the Debtor's agreement with American General, the Debtor should not have continued to draw from the Union Planters Bank account, that alone is not enough to deny the confirmation of her plan under § 1325(a)(3). A debtor's prepetition conduct is but one factor in the good faith analysis. The primary issue is the Debtor's sincerely-intended repayment. This Debtor has shown, by her previous payments to American General, that she intended to repay her debt and ceased paying due to financial difficulty. Her sincere intention to repay her debts under the plan has not been called into doubt by American General. Nor has American General challenged the confirmation regarding any of the other good faith factors enumerated in *Okoreeh–Baah.*

American General argues that the Debtor knew that the account was to be terminated and that Union Planters Bank was to release its mortgage. An authorization of termination was signed by the Debtor. It was certainly reasonable for her to think that no more effort was required on her part. In fact, the degree to which American General relied on the Debtor to transact its business in this case is questionable as is the conduct of Union Planters Bank after apparently being notified by the Debtor and American General that the $6,361.74 check delivered to it was conditioned on the termination of the Debtor's line of credit.

For the reasons stated herein, American General's objection will be overruled and the Debtor's Amended Chapter 13 Plan will be confirmed. An appropriate order will be entered.